**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ak-Chin Indian Community , | No. CV-17-00918-PHX-DGC |
| Plaintiff/Counterclaim Defendant, | **ORDER** |
| v. | |
| Central Arizona Water Conservation District, | |
| Defendants/Counter-claimant/Crossdefendant, | |
| v. | |
| United States of America, et. Al., Defendant/Crossclaimant. | |

Plaintiff Ak Chin Indian Community (the "Community") sued Defendant Central Arizona Water Conservation District ("CAWCD") for declaratory judgment and a permanent injunction regarding delivery of Central Arizona Project ("CAP") water to the Community. Doc. 1. CAWCD counterclaimed, seeking the opposite result. Doc. 16. The Court joined the United States as a party under Rule 19 (Doc. 26), and the United States filed a crossclaim against CAWCD seeking declaratory relief regarding interpretation of relevant statutes and contracts as they relate to the Community's water rights (Doc. 102). CAWCD asserted claims against the United States, but the Court dismissed them on sovereign immunity grounds. Doc. 89. Thus, the remaining claims in this case are the

Community's claims against CAWCD, CAWCD's claims against the Community, and the United States' claims against CAWCD.

The parties have filed motions for summary judgment (Docs. 108, 107, 112), and oral argument was held on March 14, 2019. On the merits of this water dispute, the Court will grant the United States' motion for summary judgment on its claims against CAWCD and grant the Community's motion on CAWCD's counterclaims against the Community. The Court will grant CAWCD's motion to dismiss the Community's claims against it for lack of standing, and for the same reason deny the Community's motion on its claims against CAWCD.[1]

## I. Undisputed Background Facts.

The Community is a federally recognized Indian tribe. *See* Doc. 106 ¶ 1. CAWCD is a multi-county water conservation district and municipal corporation authorized to operate and maintain the CAP, a system of canals, aqueducts, and related structures that deliver Colorado River water throughout central and southern Arizona. Doc. 106 ¶ 2. "The United States" in this case includes a number of federal officials and agencies that oversee reclamation matters. The Court will use the term "Secretary" to describe the role of the Secretary of the Interior in matters discussed in this order.

### A. The 1984 Act and 1985 Contract.

This case concerns the Ak Chin Water Rights Act of 1984, referred to and cited in this order as the "1984 Act." *See* 1984 Act, Pub. L. No. 98-530, 98 Stat. 2698 (Oct. 19,

---

[1] Before oral argument, the Court distributed to the parties a draft order. *See* Doc. 120. The draft was distributed solely to focus the hearing and help the Court avoid error in this complex area of law. As the Court explained at the time: "The draft order does not reflect the Court's final decision on the motions. That decision will be made only after the Court has heard and considered the parties' oral argument." *Id.* This order, issued after oral argument and after receiving the parties' written comments on the draft order (Docs. 123, 124), sets forth the Court's final decision on the merits of this case. This order differs considerably from the draft order, and the draft order should not be cited for any purpose. The Court concludes that it is unnecessary to determine the portions of Indian Pool water available for possible delivery to the Community or others, an issue that was addressed in the draft order. That discussion was possibly incorrect, and expresses no view of the Court on the issue.

1984). The 1984 Act addressed water the Community is entitled to receive from the Colorado River.

Section 2(a) of the Act required the Secretary to deliver a permanent water supply to the Community of "not less than seventy-five thousand acre-feet of surface water suitable for agricultural use except as otherwise provided under subsections (b) and (c)." 1984 Act, § 2(a).[2]

Section 2(b), which is the section in dispute in this case, concerns an additional 10,000 acre-feet ("AF") of water the Community may receive under certain conditions. It provides that "[i]n any year in which sufficient surface water is available, the Secretary shall deliver such additional quantity of water as is requested by the Community not to exceed ten thousand acre-feet." 1984 Act, § 2(b). The section further states that "[t]he Secretary shall be required to carry out this obligation referred to in this subsection only if he determines that there is sufficient capacity available in the main project works of the Central Arizona Project to deliver such additional quantity." *Id*.

Section 2(c) of the 1984 Act addresses the same obligation as § 2(a), but reduces the amount of water deliverable in "time of shortage" from 75,000 AF to 72,000 AF. *Id.*, § 2(c). Section 2(c) is not at issue in this case.

Section 2(f) identifies the source of water for the 75,000 AF called for in § 2(a) and, in times of shortage, the 72,000 AF called for in § 2(c). It states that "[t]he water supply referred to in subsections (a) and (c) shall be supplied from an aggregate of the following": (1) a permanent supply of 50,000 AF to be diverted from the Colorado River under the Act of July 30, 1947 (61 Stat. 638), for beneficial use on lands of the Yuma Mesa Division of the Gila Project; and (2) CAP water allocated to the Community in the Notice of Final Water Allocations to Indians and non-Indian Water Users and Related Decisions (48 Fed. Reg. 12446, March 24, 1983) as is necessary to fulfill the Secretary's water delivery obligations. *Id.*

---

[2] An acre-foot of water is the volume of water required to cover an acre of land with one foot of water – approximately 326,000 gallons. *See San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1222 n.1 (9th Cir. 2017).

These statutory water rights are also reflected in a contract between the Secretary and the Community that will be referred to in this order as "the 1985 Contract." The 1985 Contract tracks exactly the provisions of §§ 2(a), (b), (c), and (f) of the 1984 Act, but renumbers them as §§ 3(a), (b), (c), and (f). *See* Doc. 102-1. Under the 1985 Contract, the Community submits a schedule of requested water deliveries to the Secretary by October 1 of each year, and the Secretary reviews the Community's requests to ensure they are consistent with the contract. *Id*. §§7(a)(1)-(2). When the Secretary orders the water to be delivered, it is delivered to the Community through the CAP operated by CAWCD.[3]

**B.    CAWCD's Contracts with the United States.**

In 1988, CAWCD and the United States contracted to construct the CAP and for the CAWCD to repay the United States for the construction. Docs. 102-3 § 2.1; 102-4. Earlier, in August 1987, CAWCD and the United States had entered into a contract for the transfer of operation and maintenance of CAP facilities to the CAWCD. *See* Docs. 102-2; 102-3 § 2.2. Pursuant to these contracts, CAWCD and the United States executed an operating agreement in 2000 to cover the details of CAP operations, maintenance, funding, environmental compliance, and commitments (the "2000 Operating Agreement"). Doc. 102-3 §§ 2.3; 3.1. Under the 2000 Operating Agreement, CAWCD is required to "[m]ake deliveries of Project Waters and collect payments therefor." *Id*. § 7.2.4. The Secretary must provide CAWCD with annual water delivery schedules for Indian contractors. *Id*. § 7.3.3. If CAWCD cannot confirm that all of the Indian water can be delivered, it must meet and confer with the United States to determine water deliveries. *Id*.

In 2007, CAWCD and the United States entered into a stipulated judgment in a dispute over the 1988 repayment contract ("2007 Stipulation"). *See* Doc. 102-5; *see also* Doc. 106 ¶ 21. Section 5 of the 2007 Stipulation states that "CAWCD shall have the exclusive right in its discretion to sell or use all Excess Water for any authorized purpose of the CAP." Doc. 102-5 § 5(d)(2). "'Excess Water' is all Project Water that is in excess

---

[3] Throughout this order, the Court will refer to the sections in the 1984 Act (§§ 2(a), (b), and (f)) without citing the corresponding sections in the 1985 Contract (§§ 3(a), (b), and (c)) unless the discussion specifically concerns the contract.

of the amounts used, resold, or exchanged pursuant to long-term contracts and subcontracts for Project Water service." *Id.*, § 5(d)(1).

### C. Other Relevant Statutes and Agreements.

#### 1. Arizona Water Settlement Act.

In 2004, Congress enacted the Arizona Water Settlement Act ("AWSA"). *See* PL 108-451, 118 Stat. 3478 (Dec. 10, 2004). The AWSA limited the total amount of CAP entitlements under long-term contracts to 1,415,000 AF, of which 650,724 AF is designated for Arizona Indian tribes ("Indian Pool" water). *Id.* § 104(c)(1)(A)(i)(I)-(II). Of this amount, 67,300 AF is to be used for resolving Indian water claims in Arizona through "future Arizona Indian water rights settlement agreements approved by Congress after the date of enactment of [the AWSA]." *Id.*

#### 2. San Carlos Water Settlement.

In 1992, Congress approved a water rights settlement establishing the rights of the San Carlos Apache Tribe. *See* Reclamation Projects Authorization and Adjustments Act of 1992, PL 102-575, §§ 3701-3709, 106 Stat. 4600 (Oct. 30, 1992) (the "San Carlos Act"). Congress directed the Secretary to reallocate the unused water from the Community's permanent allocation set forth in § 2(f)(2) of the 1984 Act. *Id.* § 3704. The Secretary was also required to amend the CAP water delivery contract between the United States and the Community "as [] necessary to satisfy the requirements of" the reallocation of the § 2(f)(2) water. *Id.* § 3706.

### D. The Current Dispute and the Parties' Positions.

Between 2003 and 2018, the Community requested the 10,000 AF of additional water under § 2(b) of the 1984 Act every year, and the Secretary agreed to provide it. *See* Doc. 106 ¶¶ 24-25. CAWCD consistently asserted that the Community was not entitled to water in excess of the sources specified in § 2(f). *See id.* ¶ 25. CAWCD nonetheless usually provided the extra water to the Community. *See* Docs. 1 ¶ 4; 1-1; 106 ¶ 25; 113-12 to 14. On October 1, 2016, the Community submitted its 2017 water order to the Secretary. Doc. 1 ¶ 36. The Community requested its full 75,000 AF under § 2(a) and

10,000 AF under § 2(b), plus additional water to cover transmission losses. *Id*. ¶ 37. The United States determined there was sufficient surface water and canal capacity available and issued the full order to CAWCD. *Id*. ¶ 38. CAWCD agreed to provide the water for 2017, but asserted that it no longer would deliver the Community's 10,000 AF under § 2(b). Docs. 1 ¶ 40; 1-1 at 63-64. The Community then filed this lawsuit. The parties' positions can be summarized as follows.

The United States and the Community read the 1984 Act and the 1985 Contract as entitling the Community to § 2(a)'s permanent allotment of 75,000 AF each year from the dedicated sources in § 2(f), and to the additional 10,000 AF called for in § 2(b) whenever the Secretary determines that "sufficient surface water is available" and CAP has the capacity to deliver the water. 1984 Act, § 2(b). Because all of the water in the CAP system is either under contract with system users or reserved for resolving future Indian disputes, there is no undesignated water in the CAP system to fill the § 2(b) provision. The United States and the Community contend, however, that the § 2(b) water can come from unused CAP water – water for which another entity has an allocation or contractual right but which is not used by that entity in a given year.

The United States provides this example: Under the AWSA, the Indian Pool portion of CAP water includes 6,411 AF allocated for an expected future water rights settlement with the Navajo Nation. AWSA § 104(a)(1)(B)(ii). Unlike the Community, the Navajo Nation has not yet reached a water rights settlement with the United States, has no water delivery contract, and therefore does not receive the 6,411 AF reserved for it each year. The United States and the Community argue that this unused water can be used by the Secretary for other Indian purposes and is "available" within the meaning of § 2(b) to help fill the 10,000 AF requested by the Community. Doc. 115 at 11-12.[4]

CAWCD sees things differently. CAWCD argues that potential users of CAP water can obtain rights to receive such water only in one way: (1) the Secretary must allocate

---

[4] Citations to page numbers are to numbers attached to the top of the page by the Court's electronic filing system, not to numbers at the bottom of the page.

water to the user, and (2) the user must enter a contract with the Secretary for delivery of the water. For ease of reference, the Court will refer to CAWCD's argument as the "two-step rule." CAWCD argues that both steps must be satisfied before CAP water can be distributed. CAWCD asserts that the Community's right to 75,000 AF in § 2(a) satisfies the two-step rule because the Community (1) has received an allocation of the water as reflected in § 2(f) of the 1984 Act, and (2) has contracted for the water in § 3(a) of the 1985 Contract (corresponding to § 2(a) of the 1984 Act). Not so for § 2(b) water. CAWCD argues that although the Community has a contract for the 10,000 AF in § 3(b) of the 1985 Contract, the Secretary has not allocated water to the Community for this purpose and the Community therefore cannot receive it from CAP water. Further, CAWCD asserts that because all water in the CAP system is either contracted for or reserved for settlement of future Indian water disputes, no CAP water is "available" for delivery to the Community within the meaning of § 2(b) of the 1984 Act.

This includes unused CAP water. CAWCD argues that any unused water in the system belongs to CAWCD under the "excess water" provision of the 2007 Stipulation and cannot be used to fill the requirements of § 2(b). For example, CAWCD contends that because the 6,411 AF discussed above has been reserved by the Secretary for a future Navajo Nation water settlement, it is not "available" to the Community under § 2(b). The fact that it is not presently used by the Navajo Nation means that it is "excess water" under the 2007 Stipulation that CAWCD can dispose of in its discretion.

Although no CAP water may be used for § 2(b), CAWCD argues that the Secretary could fulfill its obligation to the Community by providing 10,000 AF of water from non-CAP sources through leases or other means. Doc. 112 at 7, 11-14. CAWCD argues that the United States is simply trying to avoid this responsibility by appropriating unused water in the CAP system – water that rightly belongs to CAWCD.

## II. Legal Standard.

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties agree that the facts of this case are not in dispute and that interpretation of the relevant statutes and contracts may occur on the cross-motions for summary judgment.

"When interpreting a statute, we look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress." *Maricopa-Stanfield Irr. & Drainage Dist. v. United States*, 158 F.3d 428, 435-36 (9th Cir. 1998). Interpretation of a contract entered into pursuant to federal law, when the United States is a party, is governed by federal law. *O'Neill v. United States*, 50 F.3d 677, 682 (9th Cir. 1995). The plain language of the contract should be considered first. *Klamath Water Users Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999).

## III. The Community's Standing.

CAWCD argues that the Community lacks standing to sue under CAWCD's operating agreement with the United States. *See* Doc 112 at 17. Before a third party can obtain relief under a contract, it must show that it is an intended beneficiary of the contract. *Klamath*, 204 F.3d at 1210.

Parties that benefit from a government contract are generally incidental beneficiaries and may not enforce the contract absent a clear intent to the contrary. *Id.* "This clear intent hurdle is not satisfied by a contract's recitation of interested constituencies, vague hortatory pronouncements, statements of purpose, explicit reference to a third party, or even a showing that that the contract operates to the third parties' benefit and was entered into with them in mind." *County of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1244 (9th Cir. 2009) (quotation marks and alterations omitted) (citing *Klamath*, 204 F.3d at 1212; *Orff v. United States*, 358 F.3d 1137, 1145 (9th Cir. 2004)).

In *Klamath*, the Ninth Circuit found irrigators that benefited from a government contract to impound irrigation water were not third-party beneficiaries for purpose of standing, even if the contract was undoubtedly entered into with the irrigators in mind. *See Klamath*, 204 F.3d at 1212. Similarly, in *Orff*, the Ninth Circuit found farmers were not clearly intended beneficiaries of a water district contract because the contract did not

manifest "an intent to create enforceable rights" in the third-party farmers. 358 F.3d at 1145. The farmers asserted that a provision requiring water users to pay assessments and charges to the water district demonstrated that the contract intended to grant them third-party rights. *Id*. at 1146. The court found that this provision merely detailed the requirements to obtain water rather than an intent to create enforceable rights for individual water users. *Id*.

The Community argues that "[w]hile [it] is not mentioned by name in the United States' various contracts with CAWCD, at least one of those contracts singles out CAWCD's obligations to make water deliveries to Indian contractors such as [the Community]." Doc. 116 at 14 (citing Doc 102-3 § 7.3.3). Because the contracts focus special attention on the obligations owed to Indian contractors, the Community contends, they "evince special consideration for and an intent to confer benefits on Indian contractors that are not generally provided to all contractors." *Id*. The Community asserts that the unique trust relationship between the United States and Indian contractors distinguishes the Community and other Indian tribes from the incidental beneficiaries in *Klamath*, *Orff*, and other Ninth Circuit cases. The Court disagrees.

The Community cites no case law to support its position. The closest Ninth Circuit authority involves a consent decree where, applying contract principles, the court held that a tribe did not have third-party beneficiary status despite the tribe's involvement in the decree negotiations, its mention multiple times in the decree, and the decree's granting of certain rights to the tribe. *See United States v. FMC Corp.,* 531 F.3d 813, 820 (9th Cir. 2008). The Ninth Circuit found that two key facts undermined the tribe's third-party beneficiary status: (1) the government, as a party to the decree, had an ongoing incentive to enforce its contract and therefore the party was assumed to be an incidental beneficiary absent a clear expression of different intent, and (2) the decree contained a paragraph that specifically disclaimed an intent to grant third-party rights. *See id*. at 820-21.

The Community's argument does not pass the "clear intent" test. The provision here, § 7.3.3, merely establishes the process that Indian contractors and the government

must follow to obtain water deliveries.  *See* Doc. 102-3.  Nothing in the provision identifies the Indian contractors as intended beneficiaries with enforceable rights.  At most, the plain language demonstrates that the operating agreement was created with the Indian communities in mind.

Further, § 3.3 of the operating agreement states that all provisions of the O&M contract apply to the operating agreement.  Doc. 102-3.  And the O&M contract specifically states:

> Nothing in this contract, express or implied, is intended to confer any rights or remedies under or by reason of this contract on any persons other than the parties to it, nor is anything in this contract intended to relieve or discharge the obligation or liability of any third person to any party to this contract.

Doc. 102-2 § 15.

The Court concludes that the Community does not have standing under CAWCD's operating agreement to bring claims against CAWCD.  The Court will grant CAWCD's motion for summary judgment on the Community's claims against CAWCD and deny the Community's motion for summary judgment on the same claims.

The Community argues that even if it lacks standing to assert claims, it should be permitted to intervene under Rule 24(a) or have its arguments considered as *amicus curiae*.  Doc. 116 at 15.  This is not necessary, however, because the Community remains a party sued in CAWCD's counterclaim.  *See* Doc. 16.  As a party in this case, the Community has a full right to participate.   In fact, the Community's motion for summary judgment specifically asks the Court to enter summary judgment on CAWCD's counterclaim against it, a request the Court will grant for reasons set forth below.  Doc. 108 at 22.

**IV.**     **Motions for Summary Judgment.**

As already noted, this case concerns § 2(b) of the 1984 Act and the corresponding provision of the 1985 contract.  Section 2(b) reads in full:

> In any year in which sufficient surface water is available, the Secretary shall deliver an additional quantity of water as is requested by the Community not to exceed ten thousand acre-feet.  The Secretary shall be required to carry out

this obligation referred to in this subsection only if he determines that there is sufficient capacity available in the main project works of the Central Arizona Project to deliver such additional quantity.

1984 Act, ¶ 2(b).  The question to be decided is whether CAWCD must deliver 10,000 AF of CAP water to the Community under this provision when directed to do so by the Secretary.  Because the answer to this question involves many statutes and contracts, the Court concludes that the easiest way to proceed is to set forth CAWCD's argument and address the parties' positions on that argument.

### A.    CAWCD's Interpretation.

CAWCD's argument rests on two primary assertions.  First, as noted above, CAWCD asserts the existence of a two-step rule – that an entity such as the Community may receive CAP water *only* if (1) the Secretary has allocated CAP water to the entity, and (2) the entity has contracted to receive the water.  Doc. 112 at 12.  Second, although the Community has an allocation of and contract for CAP water to satisfy § 2(a) of the 1984 Act, it has no specific allocation of water for § 2(b).  As a result, even though § 2(b) calls for the delivery of 10,000 AF of water to the Community in years when "sufficient surface water is available," no CAP water is "available" to fill this conditional right.  *Id*. at 11.  All CAP water "is completely allocated and contracted [or] reserved for future Indian water settlements."  *Id.* at 13.

CAWCD makes some related arguments.  It asserts that although § 2(f) water could have satisfied all of the Community's water rights prior to 1992, including the 10,000 AF called for in § 2(b), the San Carlos Act reallocated "Excess Ak-Chin Water" to the San Carlos tribe – meaning all water above the 75,000 AF called for in § 2(a) – and the United States has not designated a new source for the § 2(b) water as directed by the San Carlos Act.  *Id*.  As a result, no water is now "available" under § 2(f) to satisfy the § 2(b) conditional right.  *Id.*

Finally, and as noted above, even if a CAP user does not use all of its CAP water in a given year, the unused water remains allocated and does not become "available" to fill

the § 2(b) allotment.  Instead, the water becomes "excess water" under the 2007 Stipulation and is controlled entirely by CAWCD.  *Id*. at 15-16; *see also* Doc. 117 at 6.

In the sections of this order that follow, the Court will address the parties' various arguments regarding the meaning and effect of § 2(b).  The Court will attempt to take the issues one by one, but many are related and overlapping.

**B.     CAWCD's Two-Step Rule.**

Oral argument on these motions made clear that CAWCD's position is founded on the two-step rule described above – that an entity may receive CAP water only if (1) the Secretary has allocated water to the entity and (2) the entity has contracted to receive the water.  Doc. 112 at 12.  One would think that CAWCD would have ample authority for this foundational principle, but its brief cites only one case: the Ninth Circuit's decision in *Maricopa-Stanfield Irr. & Drainage Dist. v. United States*, cited above.

*Maricopa-Stanfield* concerned a dispute over water allocated to the San Carlos Apache Tribe in the San Carlos Act.  Agricultural irrigation districts sued the United States, claiming that Congress' allocation of CAP water to the San Carlos Tribe deprived them of CAP water in which they held compensable property rights.  The irrigation districts sought damages for the taking of this property.  The Ninth Circuit held that the districts had no property rights in the CAP water allocated by the San Carlos Act.  The court of appeals found no grant of a property right in the language or intent of the statute relied on by the districts.  158 F.3d at 436-39.

CAWCD cites *Maricopa-Stanfield* as support for the two-step rule and describes the rule in these terms: "in order to have an entitlement to CAP water, an entity, including Ak-Chin, must have *both* an allocation *and* a contract for such water."   Doc. 112 at 16 (emphasis in original).  *Maricopa-Stanfield* contains a background section describing the creation and operation of the CAP.  The background section states that "[t]he Secretary was left to devise and implement a system for determining how and to whom CAP water would be sold" and "settled upon an allocation-contract mechanism for distributing CAP water."  158 F.3d at 431.  The background discussion also notes that "[w]hen a user does

not contract to receive all the water available to him under his allocation, his right to contract for that water devolves upon the Secretary." *Id.* at 437.

These background statements do suggest that entitlements to CAP water can be obtained through allocation and contract, but *Maricopa-Stanfield* did not address whether this is the *only* method by which an entity can obtain a right to CAP water as CAWCD contends. Nor did it address whether the Secretary, particularly when authorized by Congress as in § 2(b) of the 1984 Act, retains discretion to deliver unused CAP water to an entity that does not have an allocation of that water. Those issues simply did not arise in *Maricopa-Stanfield*, and the Court cannot read the case as having settled them. To be clear, the Court does not disagree that an entity can obtain rights to CAP water through an allocation and contract. But the Court cannot accept CAWCD's assertion that this is the only means.[5]

During oral argument, counsel for CAWCD asserted that the two-step rule is also supported by "the *Smith* case," which the Court takes to mean *Smith v. Central Arizona Water Conservation District*, 418 F.3d 1028, 1032 (9th Cir. 2005), a case cited in CAWCD's brief for other propositions. *Smith* was a lawsuit filed in Arizona state court by certain CAP water users against CAWCD. The case was removed to federal court, and the district court held that abstention was not required under *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), and that the water users were not third-party beneficiaries of contracts between CAWCD and certain irrigation districts. The Ninth Circuit affirmed, holding that abstention was not required and that the land owners were not third-party beneficiaries who could bring an action against CAWCD. 418 F.3d at 1032-38.

---

[5] In its reply brief, CAWCD quotes footnote 5 of *Maricopa-Stanfield* as holding that allocated water is "the *maximum* amount of CAP water" available to CAP users. Doc. 117 at 9 (emphasis in brief). But this language is not found in the *Maricopa-Stanfield* footnote. *See* 158 F.3d at 431 n.5. The word "maximum" appears only once in the case, and for an entirely different proposition. *See id.* at 434. Nor do CAWCD's other arguments from footnote 5 support its two-step rule. Like the language quoted above, the footnote is part of the background section of the case and does not address whether the allocation-contract method is the only means the Secretary may use to fulfill a conditional right like that found in § 2(b).

The background section of *Smith*, like the background section of *Maricopa-Stanfield*, discusses the nature of the CAP and CAWCD. A footnote in that section cites *Maricopa-Stanfield* and states that "[t]he specific method selected for allocation of project water was an 'allocation-contract' mechanism, whereby the Secretary apportioned the right to purchase project water" and "specific users . . . could then purchase project water by entering subcontracts with the United States and the Conservation District." *Id.* at 1031 n.2. While this footnote in the background section describes a method by which users acquire rights to CAP water – maybe even the primary method – it does not address whether this is the only method. Nor does it address whether the Secretary, when authorized by Congress in § 2(b) of the 1984 Act, retains discretion to deliver unused CAP water to an entity that does not have an allocation of that water. Those issues were not presented in *Smith* and the Court cannot read *Smith* as having settled them.

The Court also notes that CAWCD's proposed two-step rule appears contrary to its own claim to "excess water" in this case. CAWCD argues that it has the priority right to all unused water in the CAP system because of the 2007 Stipulation – which is a contract between CAWCD and the United States – but it does not identify any allocation of such excess water. If the two-step rule is indeed the *only* method for obtaining rights to CAP water as CAWCD claims, then CAWCD itself lack a right to excess water because it satisfies only the second of the two steps. During oral argument, CAWCD responded to this dilemma by asserting that it is different from other CAP users because of its unique position as the contractor for transportation of the CAP water, but it cites no authority for this exception to its own rule, and such an exception certainly is not mentioned in *Maricopa-Stanfield* and *Smith*.

## C. The Secretary's Broad Discretion.

In effect, CAWCD argues that Congress eliminated the Secretary's authority and discretion to deliver Colorado River water to anyone who has not complied with the two-step rule. CAWCD would have this Court hold that unless an entity has received an allocation and entered a contract, the Secretary has no power to deliver CAP water to that

entity, even if the water is not being used by other CAP users. This position places too severe a limitation on the Secretary's considerable powers.

In *Maricopa-Stanfield*, the Ninth Circuit emphasized that Congress "gave the Secretary of the Interior broad administrative authority over [Colorado River] water, including the power to apportion water *within the states*." 158 F.3d at 431 (emphasis added); *see also* 438 n.18. This wide-ranging authority to decide who receives Colorado River water has also been recognized by the Supreme Court. In *Arizona v. California*, 373 U.S. 546 (1963), the Supreme Court stated that Colorado River water "could be obtained from the Secretary alone[.]" *Id.* at 580. It continued: "The supremacy given the Secretary's contracts was made clear" in the Boulder Canyon Project Act of 1928, which provided that even compacts between states were "subject to all contracts, if any, made by the Secretary of the Interior under section 5 before Congress approved the compact." *Id.* (quotation marks and citation omitted). The Supreme Court further explained that provisions of the 1928 Act, "even without legislative history, are persuasive that Congress intended the Secretary of the Interior, through his § 5 contracts, both to carry out the allocation of the waters of the main Colorado River among the Lower Basin States *and to decide which users within each State would get water*." *Id.* (emphasis added).

Indeed, *Maricopa-Stanfield* explained that "[o]ut of respect for the Secretary's broad discretionary authority over the waters of the Colorado River," the Ninth Circuit would assume that "'had Congress intended to fetter the Secretary's discretion, it would have done so in clear and unequivocal terms.'" 158 F.3d at 437-38 (quoting *Arizona*, 373 U.S. at 580). The Court adopts the same assumption, and in this case CAWCD has cited no statute where Congress clearly and unequivocally fettered the Secretary's discretion in the manner CAWCD describes. Such a limitation certainly cannot be found in the 1984 Act, which specifically provides that "[n]othing in this Act shall be construed to enlarge or diminish the authority of the Secretary with regard to the Colorado River." 1984 Act § 8. What is more, Congress specifically stated in § 2(b) of the 1984 Act that the Secretary "shall" deliver 10,000 AF of water to the Community when sufficient surface water and

CAP capacity are available. 1984 Act, ¶ 2(b). The Secretary's authority would seem to be at its apex when the Secretary is acting pursuant to such a Congressional directive.

Other documents in this case confirm the Secretary's wide power to determine the uses of CAP water. Section 8.7(a) of CAWCD's 1988 repayment contract reserves to the Secretary the right to determine the quantity of Colorado River water to be released and used by the CAP each year, including "the quantity of water which may be allocated by the Secretary for use on Indian lands." Doc. 102-4 § 8.7(a). The repayment contract also directs that CAWCD shall make "all project facilities . . . available for the diversion, transportation, and carriage of water for Indian and non-Indian uses pursuant to arrangements or contracts therefor entered into on their behalf with the Secretary." Doc. 102-4 ¶ 8.17.

### D.    The 1984 Act and the Meaning of "Available" in § 2(b)

CAWCD's second fundamental argument is that the word "available" in § 2(b) means only water covered by the two-step rule – water allocated by the Secretary and contracted for by the entity. The Court does not find this argument consistent with the general intent of the 1984 Act, the language of the Act, or the cases cited by CAWCD.

### 1.    General Intent of the 1984 Act.

Under a statute passed in 1978, the Community was granted the right to receive from the United States a permanent annual water supply of 85,000 AF. *See* Public Law 95-328, 92 Stat. 409, § 3. The 1978 Act required the Secretary to procure this permanent water supply for the Community as soon as possible, and in any event within 25 years. *Id.*

In 1983, the United States and the Community agreed to modify this arrangement and signed an Agreement in Principle for Revised Ak-Chin Water Settlement. *See* 1984 Act, Pub. L. No. 98-530, § 1(1). The 1983 Agreement in Principle led to passage of the 1984 Act at issue in this case. *Id.*, § 1(7).

In the "findings" section of the 1984 Act, Congress stated that "the main purpose of the [1983] Agreement in Principle is to accomplish a prompt and economic fulfillment of the intent of [the 1978] Act" – the Act that promised the Community 85,000 AF per year.

*Id.*, § 1(2). The intent was to provide the Community with the 85,000 AF contemplated in the 1978 Act whenever enough surface water was available. As the Ninth Circuit has explained: "Congress directed the Secretary of the Interior annually to deliver a permanent supply of 75,000 AF of CAP water to the . . . Community, or 85,000 AF of water when sufficient water was available." *Maricopa-Stanfield*, 158 F.3d at 432 (footnote omitted). Thus, the 10,000 AF called for in § 2(b) of the 1984 Act is not a mere side benefit that could be readily discarded. Congress understood it to be a fulfillment of the 85,000 AF given to the Community in the 1978 Act.

It is also clear that the 1984 Act concerns CAP water and not, as CAWCD asserts, 10,000 AF of water from outside CAP. Section 2(a) of the Act provides that "the Secretary shall deliver annually a permanent water supply from the main project works of the Central Arizona Project to the southeast corner of the Ak-Chin Indian Reservation of not less than seventy-five thousand acre-feet of surface water[.]" *Id.*, § 2(a). Section 2(b) requires the Secretary to deliver 10,000 AF of water when sufficient surface water is available and "there is sufficient capacity available in the main project works of the Central Arizona Project[.]" *Id.*, § 2(b). Section 2(c) defines the possible "time of shortage" by reference to "Central Arizona Project water." *Id.*, § 2(c). Other portions of the 1984 Act also refer to CAP water and the CAWCD. *See, e.g., id.*, §§ 2(i), 2(k), 7(b)(1), 7(b)(2).[6]

Despite this history, CAWCD argues that CAP water is not "available" for § 2(b) because there is no allocation of that water and therefore no satisfaction of the two-step rule. CAWCD's interpretation would guarantee that the Community will never receive § 2(b) water from the CAP, a result at odds with the plain intent of the 1984 Act and its history in the 1978 Act. True, the 1984 Act did not assure a permanent source for § 2(b) water as it did for § 2(a) water, but Congress clearly contemplated that an additional 10,000 AF of CAP water would be provided to the Community whenever feasible, consistent with

---

[6] Section 2(f) refers to CAP water allocated to the Community and an additional "fifty thousand acre-feet of surface water per annum to be diverted from the Colorado River." *Id.*, § 2(f)(1). Counsel for CAWCD stated during the hearing that this is all considered CAP water.

the original 85,000 AF promised in the 1978 Act. Any reading of the 1984 Act that effectively eliminates § 2(b) water runs counter to this history and intent.

### 2. Language of the 1984 Act.

By asserting that "available" water is limited to water that has not been allocated, and that all CAP water has been allocated through contracts with other entities or reserved for future Indian settlements, CAWCD effectively argues that the Community's "available" CAP water is limited to the sources specified in § 2(f) of the 1984 Act. But this argument runs counter to the express language of § 2(f), which makes clear that it provides the sources of water only for §§ 2(a) and 2(c). It does not mention § 2(b). In other words, Congress did not limit § 2(b) water to the sources specified in § 2(f) as it did § 2(a) water, and "[w]here Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993). Congress instead provided that § 2(b) water may come from a broader set of sources – any "sufficient surface water [that] is available." *Id.*, § 2(b). The language of the statute refutes CAAWCD's narrow reading.

Additionally, "[w]hen interpreting a statute, we look first to the plain language of the statute[.]" *Maricopa-Stanfield*, 158 F.3d at 435. The word "available" has a plain meaning. Merriam-Webster Dictionary defines it as "present or ready for immediate use." (online at: https://www.merriam-webster.com/dictionary/ available). The Cambridge English Dictionary defines it as "able to be obtained, used, or reached." (online at https:// dictionary.cambridge.org/us/dictionary/english/available).

In this case, the plain meaning of "available" suggests that § 2(b) water includes any surface water the Secretary can obtain, use, or reach. Given the Secretary's broad authority to determine where and by whom Colorado River water can be used within Arizona, the Court cannot conclude that the Secretary is unable to reach unused CAP water due to a narrow and unsupported meaning of "available."

In fact, CAWCD essentially concedes that unused CAP water is "available" for use by others – itself. But CAWCD asserts that the unused water may be used only as excess water under its 2007 Stipulation and not by the Community as § 2(b) water. CAWCD makes this argument despite the fact that it has only a contract for excess water (the 2007 Stipulation), while the Community has a contract (§ 3(b) of the 1985 Contract) and a statute (§ 2(b) of the 1984 Act) for § 2(b) water. CAWCD's argument for a narrow meaning of "available" is not persuasive.

### 3. CAWCD's Cases.

CAWCD cites two cases to support its narrow reading of "available." *See* Doc. 112 at 11. Neither provides support.

The first case, *Cappaert v. United States*, 426 U.S. 128 (1976), addressed whether the President's creation of a national monument under the American Antiquities Preservation Act also reserved appurtenant groundwater needed to preserve the monument. The Supreme Court held that when the federal government reserves land for a national monument, by implication it also reserves water rights sufficient to accomplish the purposes of the monument. *Id.* at 139. As a result, the Supreme Court held that a nearby rancher could not pump groundwater at a rate that would defeat the purpose of the monument.

In reaching this conclusion, the Supreme Court made this statement: "In determining whether there is a federally reserved water right implicit in a federal reservation of public land, the issue is whether the Government intended to reserve unappropriated and thus available water." *Id.* CAWCD cites this sentence for the proposition that appropriated water is not "available" water, and that CAP water allocated to other uses therefore is not "available" within the meaning of § 2(b) of the 1984 Act. But the Supreme Court in *Cappaert* was not addressing the question of when water in a federal distribution system is available to the Secretary for a one-year conditional delivery to an Indian tribe under a federal statute. And it certainly was not addressing the meaning of the 1984 Act or § 2(b). The Supreme Court instead focused on a narrow and unrelated

question: whether the President's declaration of a national monument under the American Antiquities Preservation Act reserves appurtenant groundwater needed to preserve the monument. If any relevant principle is to be drawn from *Cappaert*, it is that the federal government cannot create a permanent source of water for a national monument from water that has already been appropriated to another purpose. That, of course, is not the question in this case. The United States does not seek to acquire a permanent source for the 10,000 AF in § 2(b). It seeks only to access CAP water on a non-permanent annual basis when it is not being used for other appropriated CAP purposes.

CAWCD also cites *Westlands Water Dist. v. United States*, 153 F. Supp. 2d 1133 (E.D. Cal. 2001), in support of its narrow interpretation of "available." But *Westlands* concerned the meaning of contracts for water from California's Central Valley Project ("CVP"). The district court focused on the meaning of specific contract provisions based on the language of the contracts, the context for that language, and extrinsic evidence related to operation of the CVP. *Id.* at 1161-63. One of the issues to be decided in *Westlands* was whether "substitute water" delivered to the San Joaquin River Exchange Contractors Water Authority and Friant Power Authority ("Exchange Contractors") was "available supply" within the meaning of a 1963 contract with the Westlands Water District. To answer this question, the district court noted that the 1963 contract did not limit "available supply" as the plaintiffs argued, observing that "[i]f the parties intended to limit 'available supply' to San Luis Unit water, they knew how to so do, as they did when they defined 'contractual commitments' in Article 11(a)(i)." *Id.* at 1162. The same principle applies in this case, but favors the United States and the Community. If Congress intended the water in § 2(b) of the 1984 Act to be limited to specific sources, it knew how to say so, just as it did when it limited § 2(a) water to the sources in § 2(f). *Westlands* thus supports the arguments of the United States and the Community that "available" in § 2(b) does not have the limited meaning argued by CAWCD.

*Westlands* also looked to extrinsic evidence in determining the meaning of "available supply":

> Extrinsic evidence shows that the Bureau's historical practice and policy, followed for forty prior years, does not count any CVP water (including any from the San Luis Unit) used to satisfy the Exchange Contractors' pre-existing vested water rights as "available supply." This course of dealing establishes that any Sacramento River and Delta water from the San Luis Unit or other source, used in any year to satisfy the Bureau's obligation to supply substitute water to the Exchange Contractors, is not "available [CVP] supply."

*Id.* at 1163.

Similar extrinsic evidence in this case supports the position of the United States and the Community. The United States has always maintained that the Secretary may order CAWCD to deliver the 10,000 AF to the Community if there is sufficient CAP water available. Doc. 1-1 at 1-66 (15 years of correspondence between the United States and CAWCD regarding delivery of § 2(b) water). *Westlands* does not support CAWCD's narrow reading of the word "available" in § 2(b).

### 4. The 1984 Act Must be Construed in Favor of the Community.

Finally, even if the 1984 Act or the wording of § 2(b) could be viewed as ambiguous, which the Court does not find in this case, legislative ambiguities are resolved in favor of Indian tribes. As the Supreme Court has explained: "We have consistently admonished that federal statutes and regulations relating to tribes and tribal activities must be 'construed generously in order to comport with . . . traditional notions of [Indian] sovereignty and with the federal policy of encouraging tribal independence.'" *Ramah Navajo Sch. Bd. v. Bureau of Revenue of N.M.*, 458 U.S. 832, 846 (1982) (citation omitted).

### E. Other Issues.

### 1. "Excess Water."

Because this part of the Court's order requires a discussion of relevant contracts, the Court will refer to the relevant provisions in the 1985 Contract as §§ 3(a) and 3(b). As noted above, the wording of these provisions is identical to the wording in §§ 2(a) and 2(b) of the 1984 Act.

The United States argues that it can obtain the Community's § 3(b) water under the 1985 Contract from unused CAP water, even if that water is allocated to or contracted for by others. CAWCD argues that unused CAP water is "excess water." The 2007 Stipulation provides that "CAWCD shall have the exclusive right in its discretion to sell or use all Excess Water for any authorized purpose of the CAP." Docs. 102-5 § 5(d). "Excess water" is defined as "all Project Water that is in excess of the amounts used, resold, or exchanged pursuant to *long-term contracts* and subcontracts for Project Water service." *Id.* (emphasis added). Thus, amounts used, resold, or exchanged pursuant to a "long-term contract" are not excess water. The 2007 Stipulation defines a "long-term contract" as "one having a term that extends to 2043 or beyond." *Id.* §4(a) n.1.

The United States and the Community argue that the 1985 Contract qualifies as a long-term contract because it has no end date. As a result, any CAP water delivered to the Community under § 3(b) of the 1985 Contract is "pursuant to" a long-term contract and by definition is not "excess water" under the 2007 Stipulation.

CAWCD does not dispute that the 1985 Contract extends to 2043 or beyond. Indeed, CAWCD conceded in its reply brief that the 1985 Contract and the Community's 1980 contract "are 'long-term contracts' within the meanings of the AWSA and the 2007 Repayment Stipulation because they extend beyond the year 2043." Doc. 117 at 4. CAWCD argued at the hearing, however, that § 3(b) of the 1985 Contract is not a "long-term contract" within the meaning of the 2007 Stipulation because the definition of "long-term contract" found in a footnote to § 4(a) of the Stipulation plainly refers to CAP water, and § 3(b) contains no right to CAP water because it does not satisfy the two-step rule.

For several reasons, the Court cannot accept this argument. First, the limiting effect of CAWCD's two-step rule cannot be accepted for reasons explained above. Second, as counsel for CAWCD conceded during the hearing, this argument would mean that § 3(a) of the 1985 Contract is a long-term contact because it satisfies the two-step rule, while § 3(b) of the same contract is not. The Court cannot find any justification for such a subdividing of the 1985 Contract, particularly when the subdivision is based on a legal

principle – the two-step rule – for which CAWCD has provided no clear authority. Third, the 2007 Stipulation expressly provides that "[n]othing in this Judgment is intended to affect the rights of long-term contractors and subcontractors of Project Water service or any Colorado River water right holders" or "may be used in any way to control the CAP water allocation process or affect its interpretation." Doc. 102-5 § 11. This would include the Community's long-term 1985 Contract.

The most reasonable interpretation of the 2007 Stipulation is that the 1985 Contract constitutes a long-term contract, and that water delivered to the Community under § 3(b) of the contract therefore is not excess water subject to CAWCD's control.

### 2. The San Carlos Act.

The 1992 San Carlos Act allocated to the San Carlos Apache Tribe water covered by § 2(f)(2) of the 1984 Act that was "not required for delivery" to the Community. *See* San Carlos Act, § 3704(a). The San Carlos Act also required the Secretary to amend the 1985 Contract between the United States and the Community "as . . . necessary to satisfy the requirements of" the reallocation of the §2(f)(2) water. *Id*. § 3706.

CAWCD argues that the water covered by § 2(f) of the 1984 Act originally was a sufficient allocation to provide both the 75,000 AF required by § 2(a) and the 10,000 AF provided by § 2(b), but that the San Carlos Act removed all water above 75,000 AF when it allocated to the San Carlos Tribe water "not required for delivery" under § 2(f)(2). This meant, according to CAWCD, that there no longer was an allocated source for § 2(b) water, and the burden was on the Secretary, as required in § 3706, to amend the Community's contract to provide such an allocation. Because the Secretary never amended the contract, CAWCD argues, it created the problem in this lawsuit – a conditional right to 10,000 AF under § 2(b) for which there is no allocated source. That problem cannot be solved, CAWCD asserts, simply by giving CAWCD's excess water to the Community. For two reasons, the Court does not agree with this argument.

First, as noted above, § 2(f) of the 1984 Act was never identified as the source for the § 2(b) water, even before the 1992 San Carlos Act. To the contrary, § 2(f) was

expressly designated by Congress as the source for the §§ 2(a) and 2(c) water. Section 2(b) water was to be provided more broadly when "sufficient surface water [was] available." Because the San Carlos Act specifically addressed § 2(f)(2) water, it did not concern the source of § 2(b) water, and its direction that the Secretary amend the 1985 Contract "as necessary" (§ 3706(a)) did not require an amendment of the 1985 Contract to address § 2(b) water because the source of that water was not affected.

Second, the Court cannot read the San Carlos Act as limiting the water otherwise available to the Community under § 2(b). The Act expressly provides that "[n]othing in this title shall be construed to quantify or otherwise affect the water rights, claims or entitlements to water of any Arizona tribe, band or community, other than the San Carlos Apache Tribe." *Id*. § 3710(i). This language, of course, includes the Community.

### 3. The AWSA.

CAWCD relies heavily on the AWSA, Pub. L. No. 108-451, 118 Stat. 3478 (Dec. 10, 2004). This statute limits the total entitlements under long-term contracts for the delivery of CAP water to 1,415,000 AF, which is further divided into separate Indian (650,724 AF) and non-Indian (764,276 AF) pools. AWSA § 104(c), 118 Stat. 3490. But nothing in AWSA imposes any allocation requirement on the delivery of the Community's 10,000 AF of water under § 2(b), as CAWCD argues. Instead, AWSA provides that nothing in the statute affects "any treaty, law, or agreement governing the use of the water from the Colorado River; or (2) any rights to use Colorado River water existing on the date of enactment of this Act." AWSA § 108, 118 Stat. 3498. When AWSA was enacted in 2004, the 1984 Act and the 1985 Contract were in existence.

### F. Declaratory Relief.

"Declaratory Relief is appropriate '(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Guerra v. Sutton*, 783 F.2d 1371, 1376 (9th Cir. 1986) (quotation omitted). Given that CAWCD has refused to deliver the 10,000 AF called for by § 2(b) of the 1984

Act and § 3(b) of the 1985 Contract, the Court concludes that declaratory relief will settle the legal relations at issue, afford relief from uncertainty, and settle the controversy among the parties. Declaratory relief is appropriate.

**IT IS ORDERED**:

1.      Defendant CAWCD's motion for summary judgment (Doc. 112) is **granted** as to the Community's standing to assert claims against CAWCD in this case, and is otherwise **denied**. The Community's claims against CAWCD are **dismissed** for lack of standing.

2.      The Community's motion for summary judgment on CAWCD's counterclaim against it (Doc. 108) is **granted** for reasons set forth above.

3.      The United States' motion for summary judgment on its claims against CAWCD (Doc. 107) is **granted**. The Court enters the following declaratory relief against CAWCD:

> CAWCD is obligated to deliver up to an additional 10,000 acre-feet of water, as authorized by § 2(b) of the 1984 Act, in any year the Secretary of the U.S. Department of the Interior determines that sufficient surface water is available and sufficient capacity is available in the main project works of the CAP.

> CAWCD's obligation to deliver water described in § 2(b) of the 1984 Act is not limited to water available from the 136,645 acre feet comprising the permanent allocations to Ak Chin.

> The phrase "Excess Water" in the 2007 Stipulation does not include water described in § 2(b) of the 1984 Act.

4.      The Clerk is directed to enter judgment in accordance with this order and terminate this action.

Dated this 26th day of March, 2019.

David G. Campbell
Senior United States District Judge